If it pleases the Court, I'm John Grenfell, representing Humboldt, the insured. Three points I wanted to emphasize. The first of which is that the loss in this case didn't arise from a nonpayment or a default. And that that is as much a requirement for the application of this exclusion as that the underlying transaction be a loan or an extension of credit. I'm sorry, did you get paid? Well, no, but the problem was not that... Not the definition of nonpayment? I would say not, Your Honor, because the problem was... I mean, Schwartz didn't come back with the money and say, here it is. No, he sure didn't. He stole the money. And that was the problem. The problem was not that Mr. Schwartz couldn't pay us back. That's what a credit risk involves. He didn't become insolvent. He put it in his van and drove to Florida. I'm sorry? He put it in his van and drove to Florida. And theft is what the bond covers in the insuring agreements, the coverage provisions. And it's what he... Why do you make a loan to somebody for a business purpose and instead of using it for their business, they use it to finance a trip to Australia or to Japan and they blow it all and they can't pay it back because the business doesn't use the money, doesn't have the money and all that, you prosecute it for theft? I mean, I don't know whether you prosecute it. You might prosecute it for theft. I don't know what the criminal law is. But it's still a loan. It's still a loan. The fact that the money was blown on purposes other than those for which the bank lent him just doesn't keep him from being a loan. It may or may not be a loan. But what I was saying was that the nonpayment or default provision isn't triggered at least until the person has an obligation to pay back. And in this case, he didn't have that obligation until long after the point when he stole the money, when the FBI was searching for him, when an arrest warrant was issued, et cetera. That's theft. I don't understand the relevance of that. I mean, once again, my example, if you have a one-year loan that's due in a year, you're supposed to use it for business purposes, and the way you're supposed to pay it back is by applying it to your business and then business generates funds and at the end of the year you can pay back the loan. Instead of doing that, you use it to go to Vegas and gamble. And you do that on day two of the loan. You're not due to pay it back for another year, but you're not going to be able to pay it back because you've just blown and gone to Vegas. I just don't see what the relevance of that is. Well, everybody agrees that the bond doesn't cover credit risk. Credit risk means somebody can't pay you back. Somebody has a contractual obligation to pay you money and they can't perform it. That doesn't happen until the obligation ripens. I mean, essentially what you're doing is you're lending money to Schwartz, who then used it to dispense the money at these ATMs. He got these fees. When he did the transaction, there was an electronic fund transfer, either directly to your bank or to Schwartz. I assume it was just an electronic fund transfer. And the thing went awry because he didn't comply with the last part of the loan arrangement. He paid interest on the money, right? He wasn't required to return the money to us until December 21, 2001. By then, he was a fugitive. And he could be prosecuted under Section 2113 because even though he had authorized possession of the money, the bank had title. And that, of course, is another point that we make that it is an essential feature of a loan that the borrower gets title to the money and the lender relies on a contractual obligation to pay it back. Title here never passed to Schwartz. It typically passed from Tehama to the customer who took it out of the ATM. And then Tehama would be paid back from that customer's bank on which the funds were drawn. So it's a four-way transfer of funds, which doesn't sound like a loan. But he did pay interest on it, right? Well, he paid a fee, which was calculated in a manner similar to interest. For what? What was the fee paid for? The fee for the use of the money. And I think you will find interest. I think you've justified the loan. I don't think so. I mean, let's say the fee exceeded the usury rate. Does California still have a usury law? I don't remember. I don't know either. When Judge Fisher and I were practicing law in California, there were many years when whether a loan was usurious was a big issue because there was a limit and if you blew it, there were long, long opinions by counsel as to whether something was a loan or not a loan. So if you were to apply it on this, you'd give them money and they'd pay you back for the use of the money. And let's say that amount exceeds the usury rate. It would be usurious. It would be a loan. It would be a usurious loan. It doesn't matter what you call it. You could call it a mortgage. I mean, people call these things loans, all sorts of things. I think it depends on whether the underlying transaction is a loan. There's a case that both sides have talked about called Rochester, which is similar to that, where it was a usury case. It's kind of an old case, so I don't know if it answers Your Honor's question, but it was clearly a loan in the sense the title to the money passed to the borrower. And he then had an obligation to pay back. Did they call it a loan? It was not called a loan. It was called a loan. They never called it a loan. That was a whole gag. They thought, oh, we're going to go around the usury law by calling it a sale and repurchase agreement or a rental agreement. But, you know, nobody was fooled. I agree with that. But the point that I'm trying to make is that interest, an interest factor, can be found in many contracts that aren't loans. An installment sales contract would be an example, where you're going to have a payment obligation, which is tied to the time value of money. Why isn't that a loan? I don't think it's a loan. I mean, it's subject to the disclosure provision of Federal Consumer Loan Disclosure Provision, isn't it, if you do an installment sale? It's subject to some regulation, but I don't know of any law under which it's a loan. Service providers often say that if you don't pay their bills within 30 days, interest begins to accrue. That doesn't mean that they're engaged in lending. We feel that one essential feature of a loan, and we don't think there's any case that undermines this, is the passage of title to the money to the borrower, and that didn't happen here. We also think it's important that there's a Where does that requirement come from? Excuse me? Where does that requirement come from? Well, it comes from a lot of the case law that we've cited. I mean, one is the Poughkeepsie case by Judge Weinfeld in New York, where he found there was a loan because title transferred. We've cited a lot of other cases which say that's part of the concept. We also have undisputed evidence that under Federal banking regulations and under generally accepted accounting principles, ATM currency like this is not treated as a loan, and the income the bank derives is not treated as interest. So, I think that's significant and a factor that puts us outside of the other cases that are being cited. The bank has emphasized that the exclusion is written in terms not only of a loan, but a transaction in the nature of a loan or an extension of credit. I think that kind of begs the question of what the nature of a loan is, but we also have history here that that language came into the bond in order to ensure that it excluded check-counting losses, which it is now recognized as doing, but that's a completely different transaction from these ATM transactions. How would you distinguish the difference between a loan on the one hand and a transaction in the nature of a loan on the other hand? They obviously both have separate meanings. Well, I think the idea is that if the terms and conditions of the underlying transaction are the same as a loan, including the passage of title to the money, we're going to treat it that way, and that was the reasoning that the courts began to apply in the check-counting cases. It was the same reasoning in that Rochester case where they looked at the leaseback of equipment and said, this really functions as a loan. The other point that Gulf makes, of course, is that Tehama was careless in its handling of this money. And, of course, in retrospect, the bank itself concluded that it should have done a better job, but that doesn't make the underlying transaction a loan and it doesn't void the insurance coverage. And, in fact, I would refer the court to the much litigated Section 533 of the California Insurance Code, which says if there are some kinds of conduct that we want to discourage by making them uninsurable, but that is only willful misconduct, and the statute said the insurer is not exonerated by the negligence of the insured or the insured's agents or others. And certainly no one would claim that the evidence here gives rise to any claim of intentional wrongdoing. You argued on the coverage issue that California law requires the insurer to prove that there's no other reasonable interpretation. What's your source of authority for that? In other words, they have to rule out all possible other interpretations. I guess the case that I would refer the court principally to I think is called McKinnon, which is one of a long line of California cases that says that, yeah, McKinnon v. Truck Insurance Exchange. It's one of a long line of California cases that says that an exclusion must be construed in favor of the insured. And one of the things that means is if there's any, even if there's a reasonable interpretation under which the loss is excluded, if there are reasonable interpretations under which it's not, the exclusion doesn't apply. As far as the bad faith issue is concerned, I'm content to rest on the briefs unless the court has questions. Okay. We're here. Full enclosure. Good morning, Your Honor. Gary Valeriano for Gulf. The first issue in this case, and really I think the basic issue, is one of what is Gulf insuring, and is Gulf insuring these kinds of events or is Gulf specifically leaving the business of doing business, banking business, to the bank itself? And if we were to take this set of facts, what essentially we'd be saying is that Gulf could, in essence, with a minimal of due diligence and very, very little controls, send its money 3,000 miles to the other side of the country to somebody who is going to take that money and really have free reign over doing what they want with it. And that risk is going to be covered by Gulf's insurance policy. Why not? I mean, that seems to be a ripe area for theft. And maybe you wouldn't want to insure the risk, that risk, but where's the loan aspect of this? In the hypothetical of lending money to somebody that's due back in a year and the guy goes off to Las Vegas and misspends the money on a true loan situation, he had title to the money. So there would be a loan document that said, you know, you have to pay us back at the end of a year. And wouldn't his defense be, I don't owe you until the end of the year. It's my money. I have title to it. Yeah, I lost it gambling in Las Vegas, but I'm going to win it back. And by the end of the year, you'll get your money. So buzz off. So that's not the situation here. The guy is taking the money and putting it in these ATMs, but he doesn't have any title to it. He has possession of it. He has possession of it. He doesn't even have really – he does have possession in a – in one sense. Go ahead. I don't think there would be any question that he had possession of the money. But going back to your hypothetical and your question, the fact of the matter is the bank demanded repayment. The bank told Mr. Schwartz, we want this money back within 120 days. I would want it back because, you know, we gave it to you as an independent contractor. You're supposed to provide a service to us, put our vault money at work, and you're not doing it. Well, I don't know that he wasn't doing it. I think the problem was that the bank realized that it had, and I quote from their own papers, they had given Mr. Schwartz inappropriate access to cash. That may be, but that doesn't have – yeah, they gave him inappropriate access. That's how he got possession of the money. But did title legally transfer because of that? I think this whole thing about title is really kind of an afterthought, a very aggressively pursued afterthought. The idea of title to money, if you look at the definitions that we've set out in all of the briefs, Humboldt's and Galt's, for example, the IBM definition of loan, a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows. Now, there's nothing in there about title. Title may be a factor in deciding whether or not this is a loan, but it is not the only factor and it is certainly not a deciding factor. How do you get summary – let's put it this way. How do you get summary judgment under California law principles which says that exclusions are very narrowly construed and all of this is supposed to cut in favor of the insured, and yet you're saying that on summary judgment, on this kind of record, you can get under California coverage principles, you're entitled to a judgment as a matter of law. If the exclusion is clear, if the purpose of the exclusion is clear, there is no ambiguity, and the facts fall within the purview of that exclusion, there's nothing to stop the summary judgment. I mean, there have been summary judgments issued on exclusions all the time. We quoted the Stanford University Hospital case, which says that if the exclusion is clear, it doesn't preclude a summary judgment, and that's what we have here. There are no facts in dispute. There are no facts in dispute. A fair trial would come up with the same set of facts. I mean, what you all disagree about are the legal consequences of the facts. On this particular issue, there are other issues concerning coverage beyond this that there may be some factual disputes, but certainly here we have no factual disputes. There is no ---- I think you cover that. Yes, there is an insuring agreement called In Transit, which provides coverage for when the bank entrusts its money to an armor carrier, that that armor carrier delivers that money to a third party, that whole process is insured. If there is something that happens during that process, that's different. I'm sorry. Well, of course it's different. Well, it's different because ---- You don't think I think, I know it's different. The point I'm trying to make is that in that case, something happens that is not expected. You're not dealing with the party whom you're entrusting your money to. In this case, they dealt with Mr. Schwartz. They went to his condominium in New Jersey and saw what he had. They got applications from him. They got credit reports from him. They did their due diligence. They sent him the money directly. He would send notes saying, I need $250,000. Please send it. This is a situation where they're dealing face to face. This is so interesting, but it really doesn't get to the thing I was asking. Okay. Sorry. Keep talking if you want. I'm sorry. So until it gets to Schwartz, then you would concede that the money belongs to the bank? Yes. So let's say it gets to Florida. Schwartz takes possession of it, and then one of the ATMs gets robbed. I don't know why. I'm assuming that somebody comes with a big polo bar and tries to take some money out. Is that covered? I'd have to look, but I believe there is coverage for ATM theft. I can't recall specifically. Let's let the loans do that process. Okay, so somebody comes to the bank, gets a loan, and you say, you know, we'll provide a certified check. The bank says, no, thank you. I want it in cash. I like the feel of cash. And you say, well, come back in two days, and we'll have $100,000 in cash for you. You don't have all the cash on hand. So they walk out of the bank holding the $100,000. I think when they get robbed at that point, it's their problem. I would agree. You would not jump in and say, oh, no, no, we're insuring that. That's certainly not the issue here, but, no, I don't believe so under the policy. I don't know why it's not the issue here, because it seems to me – and how about if you make a loan, if the bank makes a loan, and the customer, instead of picking it up at the bank, says, mail me the certified check, and the check gets adverted in the mail, and somebody steals the check, forges it, and cashes the check before it has been received by the loan recipient. I think you don't have any doubt that that would be covered. That certainly would be the bank's money at that point, before it ever reached the recipient, yes. Let me try to understand. Why is that different here, then? Well, the money got to Schwartz. The money was in – it was intended to go to Schwartz. He got it. He used the money for his own purposes. And when they demanded the money back within 120 days, instead of complying with that, he put it in his car and drove away. $5 million. We're not saying that this $5 million was in ATMs. It clearly wasn't. It was with Schwartz. They got 3.6 back, and there's 1.4 still outstanding. The bank's purpose – let me see if I have this down correctly – was to stash the ATM machines. They wanted to take kids' money, put them in ATM machines, and that's the way the bank does business. The bank benefits by that. That's our starting point, correct? And instead of doing that directly, they used Schwartz, who had all these ATM machines, and he was the one that did all the scuffling, so to speak, to make all this happen for the benefit of the bank. Schwartz was going to get paid, compensated for that service. He's really rendering the service, in effect, for the bank, isn't he? Well, I don't know who was – they're taking the position that they were providing service to him, but in any event, he was – But the bank was the one that's going to benefit by all of this, right? Not necessarily – well, I mean, certainly the bank – In place of the ATM machines, the bank doesn't have the opportunity to do business. So they need Schwartz somehow to make that happen. It seems to me that it's more like a service type of arrangement here than a classic loan. If this were a classic ATM operation, that might be the case. A classic ATM operation, as we've described in our papers, is you send the money, the bank sends the money to another bank. The bank gives that money in prepack cassettes to an armored service, who then takes the money to an ATM, puts the cassette in, and then takes the one out and brings it back to the bank. They were doing it that way. They were letting Schwartz do this. They were giving him the money directly, yes. And that was the first rule in their own papers, which we've cited. The ATM operator is never to have access to the cash. Yet, in this case – So they intended to set it up as a non-loan, but because they didn't do it right, it became a loan. That's certainly one of the aspects. I think that in this case specifically, the way it was set up, this was flat out a loan or something in the nature of a loan or an extension of credit. And that's important to remember. This isn't simply a loan exclusion. This is written broader than that. And certainly this has aspects of a credit extension. We've talked about title, but, you know, the bank itself, in an admission, said this is really a lease. This is what they explained to Mr. Schwartz when they asked for their money back. And a lease, of course, is an extension of credit whereby title does not pass. When I lease my car, I don't get title. The bank still has title, but I have the car. If I were to take that car to Mexico, I mean, I'm not going to – obviously I'm doing something that I shouldn't be doing. And that's – you know, but that's all part of the credit risk. So if we're dealing with this type of unusual situation here, should we not then, you know, reach out to the basic principle of law that you interpret the contracts against the person who drafts it, if it's a person who's drafting a contract, in this case, against the insurance company that tries to deny coverage? Well, again, we've cited authority for the proposition that the standard financial institution bond is a product of joint drafting between the American Bankers Association and the – Beyond that, still should it not be interpreted against the insurance company? But, Your Honor, it's focusing on simply a loan and the definition of a loan in a hyper-technical sense. Again, if you look at the definitions of loan that we've cited, there's nothing in there that says that one of the requirements of a loan is that title passes. Credit extension, something in the nature of a loan, those are also included in the exclusion. And it's written in a broad fashion so that it would encompass these types of things. You know, this is the type of incident that really is covered by this clause. I don't – I think that – That's a bottom-line conclusion. Good. I mean, it is a bank dealing with a customer, knowing full well what that customer offers and making a conscious decision that we will do business with you  And that's what they did here. And they even bent the rules within their own internal rules to do that. And I don't see that that risk falls with the insurance company rather than the bank. Okay. Thank you. Thank you. Did you want to take, Mr. Lombardo? I'll just make one observation, Your Honor, because both sides have cited the IBM Hochipsy case from New York by Judge Weinfeld. And counsel mentioned a definition there of loan, which didn't refer to the passage of title. But the court in that case said, once plaintiff deposited its money with Penn Square, it no longer owned that money, but instead owned the indebtedness of the bank to it, a mere show of inaction. That's the concept of a loan that we find in all of these cases, and we don't find on the record here. Okay. Thank you. Thank you, Your Honor. You may be dismissed.
judges: Kozinski, Fisher, Block